**No. 25-6184**

# United States Court of Appeals for the Tenth Circuit

ABBVIE INC.; ALLERGAN, INC.; DURATA THERAPEUTICS; ABBVIE PRODUCTS LLC; PHARMACYCLICS LLC; ALLERGAN SALES, LLC,

*Plaintiffs-Appellees,*

v.

GENTNER DRUMMOND, in his official capacity as Attorney General of Oklahoma,

*Defendant-Appellant*.

On Appeal from the United States District Court for the Western District of Oklahoma, No. 5:25-cv-00726, Judge Patrick R. Wyrick

**RESPONSE BRIEF OF APPELLEES**
**ORAL ARGUMENT REQUESTED**

PAUL DEMURO
FREDERIC DORWART, LAWYERS PLLC
124 E. 4TH ST.
TULSA, OK 74103
(918) 583-9957
pdemuro@fdlaw.com

MATTHEW S. OWEN
MEREDITH M. POHL
LUCAS H. FUNK
JACK L. FERGUSON
KIRKLAND & ELLIS LLP
1301 PENNSYLVANIA AVE. N.W.
WASHINGTON, D.C. 20004
(202) 389-5000
matt.owen@kirkland.com
meredith.pohl@kirkland.com
lucas.funk@kirkland.com
jack.ferguson@kirkland.com

*Counsel for Appellees*

## TABLE OF CONTENTS


**TABLE OF AUTHORITIES** ..... iii

**STATEMENT OF RELATED CASES** ..... ix

**GLOSSARY** ..... x

**INTRODUCTION** ..... 1

**ISSUES PRESENTED** ..... 3

**STATEMENT OF THE CASE** ..... 4

**I. The 340B Pricing Program.** ..... 4

**II. Contract Pharmacies And The Replenishment Model** ..... 7

**III. Manufacturers' Contract-Pharmacy Policies** ..... 11

**IV. The Oklahoma Law And This Litigation.** ..... 14

**SUMMARY OF THE ARGUMENT** ..... 16

**STANDARD OF REVIEW** ..... 18

**ARGUMENT** ..... 19

**I. Oklahoma's Law Regulates Access To 340B Pricing.** ..... 19

**II. AbbVie's Supremacy Clause Claims Are Likely To Succeed On The Merits.** ..... 26

A. Oklahoma's Law Displaces Exclusive Federal Enforcement. ..... 26

B. Oklahoma's Law Impermissibly Regulates A Federal Program. ..... 35

C. Oklahoma's Law Overrides The 340B Program's "Offer"-Based Structure. ..... 38

D. Oklahoma's Law Frustrates Manufacturers' ADR Access By Banning Necessary Claims Data. ........................ 46

E. Oklahoma's Law Intrudes Into The 340B Program's Comprehensive Scheme. ....................................................... 48

**III. AbbVie's Takings Claim Is Likely To Succeed On The Merits. ............................................................................ 50**

A. Oklahoma's Law Effectuates Physical Takings By Compelling Discounted Sales. ............................................... 50

B. Oklahoma's Law Is Coercive, Not Voluntary. ....................... 54

C. Oklahoma's Takings Are Not For Public Use. ...................... 58

**IV. *McClain*, *Fitch*, And *Murrill* Do Not Apply Here. ................. 63**

**V. AbbVie Has Satisfied The Remaining Preliminary Injunction Factors. ..................................................................... 67**

**CONCLUSION ........................................................................... 69**

**REASONS WHY ORAL ARGUMENT SHOULD BE HEARD ......... 70**

**CERTIFICATE OF COMPLIANCE**

**CERTIFICATE OF SERVICE**

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AbbVie Inc. v. Fitch*,
152 F.4th 635 (5th Cir. 2025) .................................................. 62, 63, 65

*AbbVie Inc. v. Lopez*,
No. 1:25-cv-00230 (D. Haw. Feb. 19, 2026) .......................................... 18

*AbbVie Inc. v. Murrill*,
166 F.4th 528 (5th Cir. 2026) .......................................................... 64

*AbbVie Inc. v. Brown*,
809 F. Supp. 3d 1341 (D. Utah 2025) .............. 17, 40, 50, 56, 57, 58, 59

*Arizona v. United States*,
567 U.S. 387 (2012) ................................................ 26, 27, 31, 44, 46, 49

*Astra USA, Inc. v. Santa Clara County*,
563 U.S. 110 (2011) ............................... 3, 5, 6, 28, 31, 32, 34, 35, 49, 54

*AstraZeneca Pharms. LP v. McClain*,
2025 WL 4092197 (E.D. Ark. Sept. 30, 2025) ................... 17, 50, 55, 65

*Barnes v. Gorman*,
536 U.S. 181 (2002) ............................................................ 36, 43, 55

*Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*,
562 F.3d 1067 (10th Cir. 2009) ........................................................ 63

*Boyle v. United Techs. Corp.*,
487 U.S. 500 (1988) ............................................................... 35, 36

*Bradshaw v. Am. Airlines, Inc.*,
123 F.4th 1168 (10th Cir. 2024) ............................................... 31, 44, 49

*Buckman Co. v. Plaintiffs' Legal Comm.*,
531 U.S. 341 (2001) ............................................................... 25, 37

*Burditt v. U.S. Dep't of Health & Hum. Servs.*,
934 F.2d 1362 (5th Cir. 1991) .... 56

*Calder v. Bull*,
3 U.S. 386 (1798) .... 50, 59

*Cedar Point Nursery v. Hassid*,
594 U.S. 139 (2021) .... 52, 53, 54

*Chamber of Com. of U.S. v. Edmondson*,
594 F.3d 742 (10th Cir. 2010) .... 41, 67, 68

*Colo. Dep't of Pub. Health & Env't v. United States*,
693 F.3d 1214 (10th Cir. 2012) .... 31

*CoreCivic, Inc. v. Governor of New Jersey*,
145 F.4th 315 (3d Cir. 2025) .... 38

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000) .... 26, 40, 41, 44

*Forest Park II v. Hadley*,
336 F.3d 724 (8th Cir. 2003) .... 43

*Free the Nipple-Fort Collins v. City of Fort Collins*,
916 F.3d 792 (10th Cir. 2019) .... 18, 61, 67

*Genesis Health Care, Inc. v. Becerra*,
701 F. Supp. 3d 312 (D.S.C. 2023) .... 34

*Geo Grp., Inc. v. Newsom*,
50 F.4th 745 (9th Cir. 2022) (en banc) .... 38

*Helfrich v. Blue Cross & Blue Shield Ass'n*,
804 F.3d 1090 (10th Cir. 2015) .... 36

*Horne v. Dep't of Agric.*,
576 U.S. 350 (2015) .... 53, 54, 55

*In re Universal Serv. Fund Tel. Billing Prac. Litig.*,
619 F.3d 1188 (10th Cir. 2010) .... 32

*Katzin v. United States*,
908 F.3d 1350 (Fed. Cir. 2018) .......... 19

*Kelo v. City of New London*,
545 U.S. 469 (2005) .......... 50, 59

*Lingle v. Chevron U.S.A. Inc.*,
544 U.S. 528 (2005) .......... 50

*McCulloch v. Maryland*,
17 U.S. 316 (1819) .......... 35

*Minn. Ass'n of Health Care Facilities, Inc. v. Minn. Dep't of Pub. Welfare*,
742 F.2d 442 (8th Cir. 1984) .......... 56

*Murphy v. NCAA*,
584 U.S. 453 (2018) .......... 40

*N.M. Dep't of Fish & Game v. U.S. Dep't of Interior*,
854 F.3d 1236 (10th Cir. 2017) .......... 62

*NIH v. Am. Pub. Health Ass'n*,
145 S. Ct. 2658 (2025) .......... 68

*Novartis Pharms. Corp. v. Johnson*,
102 F.4th 452 (D.C. Cir. 2024) .......... 7, 8, 10, 11, 14, 36, 39, 47, 51

*PhRMA v. McClain*,
95 F.4th 1136 (8th Cir. 2024) .......... 63, 64

*PhRMA v. Morrisey*,
760 F. Supp. 3d 439 (S.D. W. Va. 2024) .......... 13, 17, 24, 32, 43, 48, 65

*Rapanos v. United States*,
547 U.S. 715 (2006) .......... 66

*Remund v. State Farm Fire & Cas. Co.*,
483 F. App'x 403 (10th Cir. 2012) .......... 40

*Robbins v. New Cingular Wireless PCS, LLC*,
854 F.3d 315 (6th Cir. 2017) .......... 41

*RoDa Drilling Co. v. Siegal*,
552 F.3d 1203 (10th Cir. 2009) .......... 18, 67

*Sanofi Aventis U.S. LLC v. HHS*,
58 F.4th 696 (3d Cir. 2023) .......... 14, 36, 39

*Skull Valley Band of Goshute Indians v. Nielson*,
376 F.3d 1223 (10th Cir. 2004) .......... 25, 26, 42, 43, 48, 65

*Stanley v. City of Sanford*,
606 U.S. 46 (2025) .......... 44

*Teltech Sys., Inc. v. Bryant*,
702 F.3d 232 (5th Cir. 2012) .......... 44

*Teva Pharms., USA, Inc. v. Weiser*,
2025 WL 2555552 (10th Cir. Sept. 5, 2025) .......... 52

*Teva Pharms., USA, Inc. v. Weiser*,
709 F. Supp. 3d 1366 (D. Colo. 2023) .......... 51, 52

*United States v. Bd. of Cnty. Comm'rs of Cnty. of Otero*,
843 F.3d 1208 (10th Cir. 2016) .......... 46

*United States v. Robinson*,
146 F. App'x 255 (10th Cir. 2005) .......... 18

*United States v. Sup. Ct. of N.M.*,
839 F.3d 888 (10th Cir. 2016) .......... 41

*United States v. Washington*,
596 U.S. 832 (2022) .......... 35, 37, 38

*US Airways, Inc. v. O'Donnell*,
627 F.3d 1318 (10th Cir. 2010) .......... 49

*Va. Hosp. & Healthcare Ass'n v. Roberts*,
671 F. Supp. 3d 633 (E.D. Va. 2023) .......... 58

*Valancourt Books, LLC v. Garland*,
82 F.4th 1222 (D.C. Cir. 2023) .......... 57, 58

*Verlo v. Martinez*,
820 F.3d 1113 (10th Cir. 2016) .......... 19, 62

*Wis. Dep't of Indus., Lab. & Hum. Rels. v. Gould Inc.*,
475 U.S. 282 (1986) .......... 27, 31

*Wos v. E.M.A. ex rel. Johnson*,
568 U.S. 627 (2013) .......... 19, 25

**Constitutional Provisions**

U.S. Const. amend. V .......... 50, 58

U.S. Const. art. VI, cl. 2 .......... 26

**Statutes**

42 U.S.C. §256b .......... 1, 4, 35

42 U.S.C. §256b(a) .......... 4, 5, 12, 39, 40, 49, 54

42 U.S.C. §256b(d) .......... 5, 6, 27, 29, 46, 49

42 U.S.C. §1396r-8 .......... 4, 54

Ark. Code Ann. §23-92-604 .......... 64

Okla. Stat. Ann. tit. 36, §117 .......... 14

Okla. Stat. Ann. tit. 36, §5400 .......... 37

Okla. Stat. Ann. tit. 36, §5401 .......... 14, 23, 37, 40

Okla. Stat. Ann. tit. 36, §5402 .......... 37

Okla. Stat. Ann. tit. 36, §5403 .......... 14, 22, 29, 37, 39, 52

Okla. Stat. Ann. tit. 36, §5404 .......... 14

**Rules**

10th Cir. R. 28.1(A) .......... 19

**Other Authorities**

42 C.F.R. §10.20 .......... 49

42 C.F.R. §10.21 .......... 6, 22, 28, 29, 30, 31, 64

61 Fed. Reg. 43,549 (Aug. 23, 1996) .......... 7, 8

61 Fed. Reg. 65,406 (Dec. 12, 1996) .......... 6, 46

75 Fed. Reg. 10,272 (Mar. 5, 2010) .......... 8

89 Fed. Reg. 28,643 (Apr. 19, 2024) .......... 6, 22, 27, 28, 30, 31, 34, 42, 49

United States Amicus Br., *AbbVie Inc. v. Weiser*, No. 25-1439 (10th Cir. 2026) .......... 3, 30, 32, 38, 45, 55, 68

Acquisition, *Black's Law Dictionary* (12th ed. 2024) .......... 22

## STATEMENT OF RELATED CASES

There are no prior appeals. There are five related appeals: *Novartis Pharms. Corp. v. Drummond*, No. 25-6182 (10th Cir. Nov. 13, 2025); *AstraZeneca Pharms. LP v. Drummond*, No. 25-6183 (10th Cir. Nov. 13, 2025); *PhRMA v. Drummond*, No. 26-6001 (10th Cir. Jan. 5, 2026); *AbbVie Inc. v. Weiser*, No. 25-1439 (10th Cir. Nov. 21, 2025); *AstraZeneca Pharms. LP v. Weiser*, No. 25-1466 (10th Cir. Dec. 22, 2025).

## GLOSSARY

| | |
|---|---|
| **ADR** | **HRSA's Administrative Dispute Resolution system**, *see* 42 C.F.R. §10.21 |
| **A.G.** | **The Attorney General of Oklahoma** |
| **HHS** | **United States Department of Health and Human Services** |
| **HRSA** | **Health Resources and Services Administration**, an agency within HHS that administers the 340B Program |
| **PPA** | **Pharmaceutical Pricing Agreement**, a contract entered between drug manufacturers and HHS |
| **TPA** | **Third-party administrators**, entities that facilitate 340B orders and eligibility determinations for covered entities and contract pharmacies |

## INTRODUCTION

This case concerns an Oklahoma law that, as the district court rightly held, violates two principles as old as the Constitution itself. First, no state may regulate the federal government's creations or otherwise impede federal law. Second, no state may compel one private party to transfer its property to another. Oklahoma's law violates both constitutional commands: It targets pharmaceutical manufacturers that contract with the federal government and forces them to surrender their medicines at severe discounts to commercial pharmacies and hospitals.

AbbVie is one of those manufacturers. To access Medicaid and Medicare Part B, AbbVie must enter into a contract with the federal government, agreeing to participate in the federal "340B Program." *See* 42 U.S.C. §256b. Through that Program, AbbVie must offer certain medications at substantial discounts—as low as one penny per drug unit—to certain hospitals (called "covered entities"). Oklahoma's recently enacted H.B. 2048 commandeers the 340B Program and compels AbbVie to provide those steep 340B price discounts on an unlimited basis to any pharmacy that partners with a covered entity.

After a full evidentiary hearing with fact and expert witnesses, the district court preliminarily enjoined H.B. 2048 as violating both the Supremacy and Takings Clauses. This Court should affirm.

***First***, H.B. 2048 targets pharmaceutical manufacturers based on their participation in the federal 340B Program, imposes sweeping new obligations upon them, and empowers state officials to enforce those new obligations. That unilaterally rewrites the terms of manufacturers' federal agreements—the bargain they struck with the United States—and displaces the exclusive administrative forum Congress established for 340B disputes. Long-settled Supremacy Clause and preemption principles forbid this.

***Second***, H.B. 2048 forces AbbVie to sell its drugs at steeply discounted 340B prices (sometimes, one penny per unit) to contract pharmacies and covered entities whenever they demand it (well beyond the federal program's terms), yet without benefits redounding to patients or the public. The Takings Clause has never permitted such private-to-private wealth transfers.

None of the Attorney General's (A.G.) arguments on appeal support reversal. He misunderstands H.B. 2048's text and operation,

proffers new "evidence" not before the district court, and cherry-picks cases with materially different, undeveloped records. But this case comes before this Court on a more substantially developed record, and after an evidentiary hearing; no circuit court has ruled in this posture. This Court is also the first to have the views of the United States government, which has filed an amicus brief supporting AbbVie's related challenge to Colorado's analogous law. U.S. Amicus Br., *AbbVie Inc. v. Weiser*, No. 25-1439, Dkt. 30 (10th Cir. 2026); *see also Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110, 119-20 (2011) (federal government's amicus brief persuasive regarding 340B Program). The United States further explains why laws like Oklahoma's cannot stand.

Because the district court got it right, and because the equitable factors favor AbbVie, this Court should affirm.

## ISSUES PRESENTED

The issues presented are:

1. Did the district court correctly hold that H.B. 2048 is likely invalid under the Supremacy Clause because it targets a federal program and its participants for discriminatory

treatment, drastically alters their obligations and rights under the program, and establishes a conflicting enforcement regime?

2. Did the district court correctly hold that H.B. 2048 likely violates the Takings Clause by compelling manufacturers to transfer their products at confiscatory prices for private use?
3. Did the district court correctly hold that the equitable factors warrant preliminary injunctive relief?

## STATEMENT OF THE CASE

### I. The 340B Pricing Program.

In 1992, Congress enacted Section 340B of the Public Health Service Act, establishing the "340B Program" as a condition of access to other federal healthcare programs. 42 U.S.C. §256b. Pharmaceutical manufacturers wishing to participate in Medicaid and Medicare Part B must sign a "Pharmaceutical Pricing Agreement" (PPA), a contract with the federal government incorporating the statute's requirements. *Id.* §1396r-8(a)(5)(A); App.Vol.VI 1321-22.

Under the PPA, manufacturers must "offer" their drugs to a statutorily enumerated set of "covered entit[ies]" for "purchase at or below the applicable ceiling price"—the 340B discount. 42 U.S.C. §256b(a)(1). The average "ceiling price" discount across AbbVie's

products is over 68% of a drug's commercial price, with some prices as low as one penny per unit. App.Vol.VI 1318.

The 340B statute also defines obligations for covered entities. ***First***, covered entities may not sell or "transfer" 340B-priced drugs to anyone other than their own patients (a practice called "diversion"). 42 U.S.C. §256b(a)(5)(B). ***Second***, covered entities may not base a state's request for a Medicaid rebate on a unit of drug they purchased at the 340B price (called "duplicate discounts"). *Id.* §256b(a)(5)(A)(i). ***Third***, covered entities must permit manufacturers to audit any records directly pertaining to the entity's compliance with these prohibitions. *Id.* §256b(a)(5)(C).

Congress vested the U.S. Department of Health and Human Services (HHS) with authority to enforce and administer the Program's rules. *Astra*, 563 U.S. at 119-22. HHS may impose civil monetary penalties if a manufacturer "overcharges" a covered entity. 42 U.S.C. §256b(d)(1)(B)(vi).

HHS's enforcement authority is exclusive: HHS can address manufacturers' alleged 340B violations, but covered entities (and local governments) cannot. *Astra*, 563 U.S. at 117. Congress chose

"centralized enforcement" in HHS to avoid "spreading the enforcement burden" beyond the federal government. *Id.* at 119.

To that end, Congress directed HHS to develop an Administrative Dispute Resolution forum (ADR) for claims that a manufacturer has "overcharged" a covered entity. *Id.* at 115-16 (citing 42 U.S.C. §256b(d)(3)(A)). HHS interprets "overcharges" to include "[c]laims … that a manufacturer has ***limited the covered entity's ability to purchase*** covered outpatient drugs at or below the 340B ceiling price." 42 C.F.R. §10.21(a)(1) (emphasis added). ADR panel members must be 340B policy experts. 89 Fed. Reg. 28,643, 28,644, 28,647 (Apr. 19, 2024).

ADR also provides manufacturers a forum to resolve concerns about covered entities' diversion or duplicate discounting. *See* 42 C.F.R. §10.21(a)(2); 42 U.S.C. §256b(d)(2)(B)(v). Before a manufacturer can bring such a claim, it must "conduct an audit of a covered entity." 42 U.S.C. §256b(d)(3)(B)(iv). Before conducting an audit, a manufacturer must present "documentation," including "sufficient facts and evidence" establishing "reasonable cause" to believe that the covered entity has violated the statute. 61 Fed. Reg. 65,406, 65,409-10 (Dec. 12, 1996).

Manufacturers typically do so by analyzing data affiliated with specific drug dispenses (called "claims data"), which is the only realistic method available to detect covered entities' noncompliance, like duplication. App.Vol.VI 1327-30, 1338, 1342, 1368. Longstanding HHS guidance dictates that covered entities must keep claims data, and that manufacturers may require it. *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 463 (D.C. Cir. 2024).

## II. Contract Pharmacies And The Replenishment Model.

Some covered entities lack an in-house pharmacy for dispensing medications to their patients. So in 1996, the Health Resources and Services Administration (HRSA), HHS's sub-agency for the 340B Program, opined that covered entities without an in-house pharmacy should be able to contract with one outside pharmacy to dispense drugs purchased at the 340B price. 61 Fed. Reg. 43,549, 43,550-55 (Aug. 23, 1996). Commenters flagged that arrangement could lead to diversion, because 340B-priced drugs would be transferred to pharmacies, who obviously are not patients of a covered entity. HRSA's response was to assume that covered entities would maintain title to, and responsibility for, the 340B-priced drugs; commercial pharmacies were to act merely

as agents of covered entities. *Id.* at 43,552-54. After a decade and a half, the status quo changed. HRSA released new guidance purporting to permit all covered entities—even those with their own in-house pharmacy—to contract with an ***unlimited*** number of contract pharmacies. 75 Fed. Reg. 10,272, 10,273 (Mar. 5, 2010).

In the following years, the number of contract pharmacies exploded from about 1,300 to nearly 23,000. *Novartis*, 102 F.4th at 457. That is unsurprising: The ability to obtain and sell heavily discounted 340B-priced drugs creates a massive buy-low, sell-high arbitrage opportunity for covered entities and their contract pharmacies.

Today, commercial pharmacies affiliated with covered entities generally rely on an inventory management system called "the replenishment model." App.Vol.VI 1302-03; App.Vol.I 133-39. Under the replenishment model, a pharmacy fills prescriptions using its own drug inventory that it purchased at market price. App.Vol.I 133. The pharmacy does not determine at the point of sale whether the customer is a covered entity's patient. *Id.*; App.Vol.VI 1302. Patients generally pay full price (even if they are a covered entity's patient). App.Vol.VI 1299, 1301-02; App.Vol.I 135. Only later is a determination made

(usually by "third-party administrators," or TPAs), using a black-box algorithm, about which dispenses went to an eligible patient. App.Vol.I 133-34; App.Vol.VI 1302-03, 1361-64.

After the eligibility determination is made, the contract pharmacy, its TPA, or the covered entity will then order replacement drugs at the 340B price to replenish the pharmacy's inventory. App.Vol.I 133-34. Those 340B-priced drugs are merged into the pharmacy's general inventory and subsequently sold at full price. *Id.* at 134-39; App.Vol.VI 1302, 1429. This process is anything but foolproof. Recent findings show more than half of audited entities were noncompliant with 340B regulations. App.Vol.VI 1305. HRSA's inspector general has observed that "[c]ontract pharmacy arrangements create complications in preventing diversion in the 340B Program [and] in preventing duplicate discounts." App.Vol.I 293; *see* App.Vol.II 322, 328.

The "spread" between the 340B price the covered entity paid and the commercial price at which the contract pharmacy sells the drug is extremely lucrative. In 2023, covered entities earned $70 billion in 340B profits. App.Vol.VI 1301. The profitability of that 340B spread has transformed the 340B Program from an adjunct to Medicaid and

Medicare Part B into a major industry of its own. Years ago, 340B sales made up only 1% of AbbVie's gross sales, but today they make up 15%. *Id.* at 1319; *see id.* at 1330 (340B Program's exponential growth "just unsustainable"). 340B profits are so significant to national pharmacy chains that any threat to the existing contract-pharmacy model poses a material risk to their business.[1]

For these reasons, covered entities and contract pharmacies are incentivized to designate the highest possible number of dispenses as 340B eligible, *Novartis*, 102 F.4th at 457-59, make questionable designations, App.Vol.I 133, 136-39, and target affluent areas of the country for expansion to maximize revenues, App.Vol.II 523; App.Vol.IV 814-27. Federal agencies have repeatedly recognized that this incentive structure materially increases the likelihood of unlawful diversion. App.Vol.I 279-79, 293; App.Vol.II 322.[2]

The explosion in contract pharmacies has not benefited the underserved patients 340B was meant to help. 340B discounts are

---

1 *See* CVS Health Corp. Annual Report (Form 10-K) (Feb. 9, 2022), at 22, https://tinyurl.com/mrykrxj8; Walgreens Boots All., Inc. Annual Report (Form 10-K) (Oct. 13, 2022), at 29, https://tinyurl.com/mu6tfzcu.

2 *See* HRSA, *Clarification of HRSA Audits* (Feb. 8, 2013), at 2, https://tinyurl.com/ycxf86cd.

rarely passed onto patients. App.Vol.VI 1369. And industry experts have observed that needy patients scarcely benefit from Program expansion, while many patients see no benefit at all. App.Vol.I 252; App.Vol.II 493. As the record evidence shows, despite the explosion of contract-pharmacy arrangements, safety-net engagement by Oklahoma covered entities has decreased and patient outcomes have not improved. App.Vol.VI 1305, 1310-11, 1385-95; App.Vol.IV 829-46, 907-09, 937-45.

## III. Manufacturers' Contract-Pharmacy Policies.

Around 2020, drug manufacturers instituted contract-pharmacy policies to rein in abuses. These policies attach "commercially reasonable" conditions to each manufacturer's 340B "offer," *Novartis*, 102 F.4th at 461, which covered entities must agree to before a manufacturer completes a sale. If covered entities refuse those terms, no sale at the 340B price occurs. Covered entities may accept the manufacturer's terms and complete a 340B purchase, reject the terms and purchase drugs at the commercial price, or forgo a purchase altogether.

Under its current policy, AbbVie offers all covered entities drugs at or below the ceiling price. App.Vol.VII 1530-31; App.Vol.I 130. But

AbbVie will no longer accept orders for 340B-priced drugs for unlimited contract pharmacies partnered with covered entities. App.Vol.VII 1530-31. Instead, for hospital-type covered entities,[3] AbbVie will accept 340B-priced orders for only one contract pharmacy, provided the covered entity lacks an in-house pharmacy and the contract pharmacy is located within 40 miles of the covered entity. *Id.* If a covered entity is unable to identify a contract pharmacy within 40 miles, AbbVie will work with the covered entity to identify a suitable alternative. *Id.*

AbbVie's contract-pharmacy policy also requires that covered entities submit claims data for contract pharmacy dispenses. Claims data are prescription information that can be used to determine whether a drug is subject to a 340B discount or a Medicaid rebate (or both). App.Vol.VI 1327-28. Covered entities do not share claims data willingly. *Id.* at 1329. That is because claims data reveal "anomalies" that can indicate covered entities' 340B noncompliance, like duplicate discounting. *Id.* at 1328-29. These data constitute a critical element for manufacturers trying to acquire the "documentation" requisite to

---

[3] "Disproportionate share" hospitals are the main kind of covered entity involved here. 42 U.S.C. §256b(a)(4). Certain other institutions also qualify as covered entities.

initiate an audit of a covered entity, which itself is a prerequisite to accessing ADR. *See id.*; *PhRMA v. Morrisey*, 760 F. Supp. 3d 439, 450-53 (S.D. W. Va. 2024).

Neither AbbVie's policy, nor Oklahoma's law nullifying it, change what price the patient pays. The patient pays full price at the counter regardless of 340B eligibility; pharmacies charge the standard price set by the patient's insurer (or the patient pays out of pocket) and split the "spread" with their TPAs and covered entities. App.Vol.VI 1299, 1325, 1359, 1421; App.Vol.I 133, 135. Indeed, drug dispenses are often only retroactively determined to be 340B dispenses, which changes nothing about what the patient already experienced (and paid) at the point of sale. App.Vol.VI 1302, 1320, 1325, 1367-68.

Further, neither AbbVie's policy nor Oklahoma's law affect whether or where a patient can access the drugs themselves. App.Vol.VI 1299, 1325, 1367-68; App.Vol.I 132. They change nothing about where drugs go: AbbVie's drugs already go anywhere they can be lawfully sold. App.Vol.I 132 ("AbbVie will deliver its drugs … to any pharmacy, anywhere."); App.Vol.VI 1326 (similar), 1422 (A.G.'s witness agreeing that "AbbVie ships its drugs to all pharmacies").

The Third and D.C. Circuits upheld contract-pharmacy policies like AbbVie's as authorized by the 340B statute. *Novartis*, 102 F.4th at 460; *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 704, 707 (3d Cir. 2023).

## IV. The Oklahoma Law And This Litigation.

In May 2025, the Oklahoma legislature enacted H.B. 2048. The law imposes new 340B contract-pharmacy obligations on manufacturers and establishes a competing enforcement apparatus. Under H.B. 2048, manufacturers cannot

> deny, restrict, prohibit, or otherwise interfere with, either directly or indirectly, the acquisition of a 340B drug by, or delivery of a 340B drug to a 340B entity…

Okla. Stat. Ann. tit. 36, §5403(A). The law defines "340B entity" to include both covered entities ***and*** "any pharmacy contracted with" a covered entity. *Id.* §5401(2).

H.B. 2048 also creates its own state-law enforcement regime, with civil penalties up to $10,000 per violation. *Id.* §5404(B). The A.G. can investigate and sue manufacturers for H.B. 2048 violations and even seek criminal liability. *Id.*; *id.* §117.

AbbVie challenged H.B. 2048 under the Supremacy and Takings Clauses and moved for a preliminary injunction. App.Vol.I 95-126. The district court then held a day-long evidentiary hearing.

AbbVie called four witnesses: (1) Alexandra Williams, a former covered-entity employee, described how contract-pharmacy arrangements work, App.Vol.VI 1344-78; (2) Edward Scheidler, the head of AbbVie's 340B Center, explained how 340B sales and AbbVie's contract-pharmacy policy work, *id.* at 1317-43; (3) Dr. Amitabh Chandra, an expert public-health economist, described how covered entities do not pass along 340B profits to patients; instead, increased 340B profits and expanded contract-pharmacy use have no effect on patient outcomes, *id.* at 1378-1400; and (4) Dr. Alice Chen, an expert public-health economist explained that contract-pharmacy expansion targets affluent, rather than disadvantaged areas, and that program growth is not associated with patients' access to healthcare or improved health outcomes, *id.* at 1295-1316. The A.G. called one expert witness, consultant Dr. Madeline Wallack. *Id.* at 1400-29.

The district court preliminarily enjoined H.B. 2048's enforcement. App.Vol.VII 1483-1508. It held that federal law likely preempts H.B.

2048 several times over, and that H.B. 2048 likely effects an unconstitutional taking by forcing private-to-private wealth transfers for no public use. *Id.* at 1492-1505.

The A.G. appealed.

## SUMMARY OF THE ARGUMENT

The district court properly issued the preliminary injunction.

***First***, H.B. 2048 is preempted. It places new obligations upon 340B manufacturers (and only those manufacturers) and creates a conflicting state enforcement regime. Oklahoma thus thrusts itself into a unified federal statutory regime, upends the careful balance Congress struck when creating the 340B Program, and frustrates the operation of federal law.

***Second***, H.B. 2048 works physical takings because it forces manufacturers to hand over their products to covered entities and commercial pharmacies for pennies on the dollar. That taking serves a private rather than public use. Oklahoma's law goes beyond the 340B Program to line the pockets of nationwide pharmacy chains, hospitals, and their business partners—a pure private-party wealth transfer. And

AbbVie's participation in federal programs does not render Oklahoma's law voluntary because AbbVie has no agreement with Oklahoma.

***Finally***, the equities favor AbbVie. AbbVie faces irreparable harm because it cannot recover the nearly $50 million in losses H.B. 2048 will compel each year. And Oklahoma has no interest in enforcing its unconstitutional law. Enjoining enforcement of H.B. 2048 would also serve the public interest because the public has a strong interest in preserving the integrity of federal healthcare programs.

The A.G.'s contrary arguments rely nearly exclusively on two circuit courts that ruled against manufacturers. Appellant Br. 3, 11-12. But those courts did so on undeveloped records materially different from the one here. Moreover, none of these courts had the benefit of the United States's views—which this Court now has—that laws like H.B. 2048 are invalid. And the A.G. largely ignores the growing body of federal decisions recognizing that state laws like Oklahoma's run afoul of federal law and the Constitution. *Morrisey*, 760 F. Supp. 3d at 450-60; *AbbVie Inc. v. Brown*, 809 F. Supp. 3d 1341, 1359-62 (D. Utah 2025); *AstraZeneca Pharms. LP v. McClain*, 2025 WL 4092197, at *5-9 (E.D.

Ark. Sept. 30, 2025); *AbbVie Inc. v. Lopez*, No. 1:25-cv-00230, Dkt. 81 (D. Haw. Feb. 19, 2026).

This Court should affirm the district court.

## STANDARD OF REVIEW

This Court reviews a preliminary injunction under the deferential abuse-of-discretion standard. *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009). Only "an arbitrary, capricious, whimsical, or manifestly unreasonable judgment" constitutes abuse of discretion. *Id.* This Court conducts a fresh analysis of any legal conclusions but reviews the district court's factual findings only for clear error, to see if they have any "rational basis in the record." *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 796-97 (10th Cir. 2019); *see United States v. Robinson*, 146 F. App'x 255, 259 (10th Cir. 2005) ("To be clearly erroneous," a factual finding must be "more than just maybe or probably wrong; it must strike us as wrong with the force of a five-week-old, unrefrigerated dead fish" (citation modified)).[4] And this

[4] The district court made numerous factual findings citing the record and the evidentiary hearing. *E.g.*, App.Vol.VII 1499 (citing AbbVie's "compelling testimony" at the "evidentiary hearing"); 1503 (discussing whether the record contained "adequate evidence"); 1504 (discussing what "the evidentiary hearing made abundantly clear," and

Court's review is limited to the evidence in the record before the district court. *Verlo v. Martinez*, 820 F.3d 1113, 1125-26 (10th Cir. 2016).

## ARGUMENT

### I. Oklahoma's Law Regulates Access To 340B Pricing.

As the district court recognized, H.B. 2048 expands access to 340B pricing. App.Vol.VII 1493-97; App.Vol.I 111.[5] But the A.G. claims the law concerns nothing more than "delivery." Appellant Br. 26. Because the A.G.'s arguments rest heavily on that premise—and collapse without it—it is worth addressing up front. A "proper analysis requires consideration of what the state law in fact does, not how the [state] might choose to describe it." *Wos v. E.M.A. ex rel. Johnson*, 568 U.S. 627, 637 (2013).

---

whether the record contained "sufficient evidence"); 1506 (factual finding regarding the public interest). Still, the A.G. insists that the district court reversed itself and disclaimed any factfinding in an unrelated discovery order. Appellant Br. 16. But the district court's opinion speaks for itself. Plus, the A.G. misses that preemption and takings questions can rest on factual underpinnings about a law's effect, even as the ultimate judgment call is a legal question. *Katzin v. United States*, 908 F.3d 1350, 1358 (Fed. Cir. 2018); *Wos*, 568 U.S. at 636-37.

[5] AbbVie cites in each section the district court's disposition where available and examples from the briefing presenting the relevant issue. *See* 10th Cir. R. 28.1(A).

AbbVie's policy puts certain conditions on its offer to sell 340B-priced drugs to covered entities. If the covered entity declines that offer, no sale takes place. The entire purpose and effect of H.B. 2048 is to ban policies and conditions like AbbVie's, thereby requiring AbbVie to complete new sales at the 340B price that AbbVie would otherwise not make. H.B. 2048 changes nothing about where drugs are delivered because AbbVie already "will deliver its drugs … to ***any*** pharmacy, ***anywhere***." App.Vol.I 132 (emphasis added); *see* App.Vol.VI 1326 (similar).

What AbbVie will not do under its policy is provide drugs ***at the lower, 340B price*** to unlimited contract pharmacies. App.Vol.VI 1324. H.B. 2048, however, forces AbbVie to sell at the 340B price when AbbVie otherwise would not. *E.g.*, *id.* at 1339 ("We're going to have to sell more at the 340B price under this law.").

The Court need not take AbbVie's word for it. The A.G.'s own expert witness expressly testified that this is how AbbVie's policy and H.B. 2048 interact:

> Q: Okay. So when you say that AbbVie refuses to ship 340B drugs, you're not saying that AbbVie refuses to ship drugs to pharmacies that may later become 340B drugs, are you?

> A: Right.
>
> Q: AbbVie ships its drugs to ***all*** pharmacies at commercial prices; right?
>
> A: Yes.
>
> Q: What you mean is that AbbVie will not sell drugs at a ***340B price*** to a covered entity if they are going to be delivered to more than one contract pharmacy; right?
>
> A: Correct.

*Id.* at 1422 (emphasis added). The A.G.'s witness then acknowledged that H.B. 2048's effect—nullifying AbbVie's policy—compels AbbVie to sell at the 340B price in circumstances beyond what federal law requires:

> Q: You know that H.B. 2048 requires AbbVie to sell drugs at a 340B price under circumstances that federal law does not require AbbVie to sell drugs at a 340B price; right?
>
> A: Yes.

*Id.* at 1418.

This Court can also take it straight from covered entities themselves (including amici here). The American Hospital Association and 340B Health describe manufacturers' policies as "denying or limiting access to the 340B price," "forcing hospitals to pay a higher price," and claim that states laws like H.B. 2048 "restore[] access to

340B pricing through contract pharmacies." App.Vol.V 1117; *id.* at 1108-09 (same); *see* Am. Hosp. Ass'n, *Fact Sheet*, at 2-3 (2025), https://tinyurl.com/yfhuefsf.[6] The federal government agrees, as codified in HHS's regulations and as explained in the United States's amicus brief. 42 C.F.R. §10.21(a)(1); 89 Fed. Reg. at 28,644; U.S. Amicus Br. 5, 15-16.

H.B. 2048's text also shows how this works. The law tells manufacturers they cannot "deny, restrict, prohibit, or otherwise interfere with" the "delivery" ***or*** "acquisition" of a "340B drug." Okla. Stat. Ann. tit. 36, §5403(A). The A.G. focuses entirely on the term "delivery" but ignores the word "acquisition" and its separate meaning. "Acquisition" refers here to the process of buying drugs. *See* Acquisition, *Black's Law Dictionary* (12th ed. 2024) ("the act of getting land, power, money," or other property, especially "by buying it"). So H.B. 2048 tells manufacturers they cannot place conditions on ("restrict") pharmacies' ability to buy ("acquire") drugs at the 340B-discounted price. That regulates more than delivery.

---

6 Amici in this appeal now conveniently abandon their earlier views, telling this Court that H.B. 2048 regulates "delivery," not price. Dkt. 59 at 11-12.

But the "delivery" provision itself ***also*** expands access to 340B pricing, smuggling price regulation in through the back door. The trick is to focus not on the term "delivery" in isolation, but also its object, a "340B drug." The term "340B drug," which does not appear in federal law, "is really a misnomer." App.Vol.VII 1495. That is because "340B drug" simply means a regular drug ***at the 340B-discounted price***. Okla. Stat. Ann. tit. 36, §5401(1) ("'340B drug' means a drug that has been subject to any offer for reduced prices [under the 340B Program]"). The drug itself is the same, whether sold at the commercial price or at the 340B price. *See* App.Vol.VI 1420 (A.G.'s witness) ("Q: You agree that when you say 340B drugs, you mean 340B-priced drugs; right? A: Right."); *id.* at 1320 ("The drug itself is the same drug that can have a multitude of prices. … [Regardless of price,] it's literally the same drug."); App.Vol.I 131 ("To clarify: there is no such thing as a '340B drug.' There are only drugs—identical in composition and quality—offered for purchase at different price points.").

Putting H.B. 2048's terms together, then, the law bans manufacturers from refusing to give contract pharmacies drugs ***at the 340B price***. Phrased affirmatively, rather than as a double negative, it

compels manufacturers to sell drugs at the 340B price where federal law does not. That is why other courts, including the one below, recognize that focusing on "delivery" to the exclusion of "price" is "artificial," and that H.B. 2048 "thus isn't really regulating the delivery of drugs … but rather the price at which those drugs must be sold." App.Vol.VII 1494-96; *accord Morrisey*, 760 F. Supp. 3d at 455 (analogous law "is about delivery *at a given price*, not delivery *per se*.").[7]

Manufacturers understand that this is how H.B. 2048 works. Covered entities understand it. The federal government understands it. The district court understands it. The A.G.'s own expert witness understands it. Apparently, the only one who does not is the A.G.

Repeating the word "delivery" over and over gets the A.G. nowhere. H.B. 2048 does not create generally applicable transportation or delivery rules, like requiring temperature-controlled trucks or vehicle

[7] The district court's pizza-parlor analogy captures this point well—if the object of the delivery is defined by what price or discount customers can demand, "that's a law regulating pricing." App.Vol.VII 1495. The A.G.'s counterexample only proves the point. The A.G.'s business can already order as many regular-price pizzas as it wants, to any location it wants. The only thing the state law would then change is enabling the business to acquire more "discounted pizzas" for its off-site workers. Appellant Br. 27-28.

inspections. It instead expands access to 340B pricing in 340B transactions, a uniquely federal domain, and by reference to federal law. For this reason, no presumption against preemption applies. *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001) (no presumption where state law touches "inherently federal" subject-matter that "originates from, is governed by, and terminates according to federal law").

Neither does H.B. 2048 regulate "public health." *Contra* Appellant Br. 21. It does not bear upon the contents of a drug, how drugs must be labeled, or to whom drugs can be prescribed. It does not regulate medical care. The law simply voids manufacturers' policies and enables hospitals and for-profit pharmacies to obtain lower drug prices from manufacturers like AbbVie—lower prices that are not passed on to patients. App.Vol.VI 1299, 1301-02, 1369. A state statute does not become a "public health" regulation evading preemption just because it may incidentally touch on medication. *See Skull Valley Band of Goshute Indians v. Nielson*, 376 F.3d 1223, 1247-48 (10th Cir. 2004).

It is H.B. 2048's operation and effect that matter—not the A.G.'s atextual, aspirational appeals to "public health." *See Wos*, 568 U.S. at

636 ("Pre-emption is not a matter of semantics. A State may not evade the pre-emptive force of federal law by resorting to creative statutory interpretation or description at odds with the statute's intended operation and effect."); *Skull Valley*, 376 F.3d at 1248 (considering the "effect of the state law at issue"). H.B. 2048 governs access to 340B pricing.[8]

## II. AbbVie's Supremacy Clause Claims Are Likely To Succeed On The Merits.

Federal law is "the supreme Law of the Land," U.S. Const. art. VI, cl. 2, and therefore preempts contrary state law. A state law is preempted when it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. United States*, 567 U.S. 387, 399 (2012) (citation omitted).

### A. Oklahoma's Law Displaces Exclusive Federal Enforcement.

Conflict preemption may occur "when two separate remedies are brought to bear on the same activity." *Crosby v. Nat'l Foreign Trade*

[8] This is all true whether a pharmacy uses the replenishment model or not. *Contra* Appellant Br. 28-30. The replenishment model underscores this point, but AbbVie's claims do not hinge on that model. App.Vol.I 111; App.Vol.V 1098. And nowhere did the district court say AbbVie's claims rise or fall with it.

*Council*, 530 U.S. 363, 379-80 (2000) (citation modified). That is because "conflict in technique" can be "fully as disruptive to the system Congress erected as conflict in overt policy." *Arizona*, 567 U.S. at 406 (citation modified). So states may not assume enforcement authority that the federal government has "reserved exclusively" for itself. *Wis. Dep't of Indus., Lab. & Hum. Rels. v. Gould Inc.*, 475 U.S. 282, 291 (1986).

H.B. 2048 erects a parallel state enforcement mechanism to police alleged 340B "overcharges." But Congress channeled enforcement of such claims solely to HHS. Oklahoma's enforcement scheme is thus preempted, as the district court held. App.Vol.VII 1500-02; App.Vol.I 113-14.

Start with the federal scheme. In Section 340B, Congress instructed HHS to provide a forum for adjudicating "claims by covered entities that they have been overcharged for drugs purchased under this section." 42 U.S.C. §256b(d)(3)(A). Pursuant to that instruction, HHS created an ADR system encompassing all alleged "overcharges," 89 Fed. Reg. at 28,645, including claims that "a manufacturer has limited the covered entity's ability to purchase covered outpatient drugs

at or below the 340B ceiling price," 42 C.F.R. §10.21(a)(1). That definition covers manufacturers' policies, which condition access to 340B pricing. *See supra* Part I; 89 Fed. Reg. at 28,644 ("overcharge complaints" include "manufacturers placing restrictions on certain covered entities' use of contract pharmacies"). Covered entities routinely bring ADR claims challenging manufacturers' policies. *See* HRSA, *340B ADR Decision Summaries*, https://tinyurl.com/yybjmha3.

In *Astra*, the Supreme Court explained that Congress made HHS the sole enforcer of the 340B Program. 563 U.S. at 114-22. That case rejected an attempt by a covered-entity operator (a county) to sue with overcharge claims as putative third-party beneficiaries of the PPA contracts. *Id.* at 116-17. The Court explained the Congress made HHS's ADR "the proper remedy" for overcharges, and that "spreading the enforcement burden … [was] hardly what Congress contemplated when it centralized enforcement" in HHS. *Id.* at 119, 122.

The upshot of *Astra* is that enforcement actions for 340B-related conduct, including overcharges, must go to ADR. So any state statute that creates a state-law overcharge cause of action conflicts with Congress's directives and is thus preempted.

That is just what H.B. 2048 creates. It provides the A.G. a state-law cause of action and state-law forum whenever a manufacturer is alleged to have "den[ied], restrict[ed], prohibit[ed], or otherwise interfere[ed] with … the acquisition of a 340B drug" by a covered entity. Okla Stat. Ann. tit. 36, §5403(A). That is no difference in substance from a complaint that a manufacturer has "limited the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price" through its contract-pharmacy policy. 42 C.F.R. §10.21(a)(1). As the district court correctly held, H.B. 2048 is therefore "an attempt by Oklahoma to police potential overcharges." App.Vol.VII 1501.

This Court can take it straight from covered entities (including amici) themselves. During HHS's ADR rulemaking, covered entities petitioned the agency to include claims against manufacturer policies in ADR because they consider such policies to create "overcharges" under the federal statutory definition. 42 U.S.C. §256b(d)(1)(B)(vi). The American Hospital Association commented that manufacturers' policies constituted an "overcharge" because such policies "limit or deny 340B pricing" to contract pharmacies, "forcing hospitals to pay a higher price

to acquire these drugs." App.Vol.V 1117; *see also* Am. Hosp. Ass'n, *Fact Sheet*, at 1-2 (2025), https://tinyurl.com/yfhuefsf (manufacturer policies "limit or deny access to 340B pricing" and state laws like H.B. 2048 "restored access to 340B pricing"). Another group observed: "When a manufacturer refuses to offer a 340B price for a drug or sets conditions on accessing that price, it necessarily means a covered entity must pay more for the drug than the 340B ceiling price." App.Vol.V 1108; *see also* Colo. Cmty. Health Network, *Comment on ADR Rule*, at 3 (Jan. 30, 2023), https://tinyurl.com/y8utn4t7 (similar).

HHS agreed, and codified claims against manufacturer policies in the ADR regulation. 42 C.F.R. §10.21(a)(1). HHS expressly describes "manufacturers placing restrictions on certain covered entities' use of contract pharmacies" as "overcharge complaints." 89 Fed. Reg. at 28,644. That is why the federal government has now weighed in before this Court. As Section 340B's enforcer, it knows best how Oklahoma is trying to "supplant [Congress's] scheme" and "arrogate to the State enforcement authority that properly belongs to the federal government alone." U.S. Amicus Br. 15-16.

To recap: AbbVie's policy violates H.B. 2048, and if AbbVie enforced its policy, the A.G. would sue under state law. This is undisputed. Appellant Br. 36 ("Such policies clearly violate Oklahoma law."). But HHS has the exclusive authority to hear and adjudicate complaints against such policies in ADR. 42 C.F.R. §10.21(a)(1); 89 Fed. Reg. at 28,644.

Hence, Oklahoma's problem: States cannot prosecute conduct when the federal government has reserved enforcement for itself. *Arizona*, 567 U.S. at 399-402; *Gould*, 475 U.S. at 289 ("It is the ***conduct*** being regulated, not the formal description of governing legal standards, that is the proper focus of concern." (emphasis added)). "Permitting [Oklahoma] to be a second enforcer" would "interfere[] with the measured … approach Congress has taken." *Colo. Dep't of Pub. Health & Env't v. United States*, 693 F.3d 1214, 1224 (10th Cir. 2012).

Oklahoma's regime carried across the fifty states would "spawn [the] multitude of dispersed and uncoordinated lawsuits" that Congress feared and the Supreme Court warned against. *Astra*, 563 U.S. at 120. And "a patchwork of state laws in this airspace, some in conflict with each other, would create a crazyquilt effect." *Bradshaw v. Am. Airlines,*

*Inc.*, 123 F.4th 1168, 1179 (10th Cir. 2024) (citation modified); *see In re Universal Serv. Fund Tel. Billing Prac. Litig.*, 619 F.3d 1188, 1198 (10th Cir. 2010) (similar). That is not what Congress intended. *Astra*, 563 U.S. at 120; U.S. Amicus Br. 15-16.

Aside from claiming that H.B. 2048 regulates only delivery (addressed above), the A.G. offers several arguments to salvage H.B. 2048. Each fails.

***First***, the A.G. protests that *Astra* was not a preemption case. Appellant Br. 33-34. That is true, but misses the point. *Astra* demonstrates Congress made HHS the sole enforcer of manufacturers' 340B obligations, and no one—not private parties, not municipalities, not states—can supplant that enforcement authority. So its logic applies equally to a state statutory cause of action targeting overcharges and manufacturers' policies. *See Morrisey*, 760 F. Supp. 3d at 458-60 (applying *Astra*).

***Second***, the A.G. argues that federal law and H.B. 2048 govern different conduct. Appellant Br. 33-35. But as explained above, that is patently false—at best, obliviousness as to how the federal program works. HHS is adjudicating contract-pharmacy policies as overcharge

cases ***right now***. *See* HRSA, *340B ADR Decision Summaries* (listing ADR adjudications of such policies), https://tinyurl.com/yybjmha3.

The A.G. then doubles down, arguing that H.B. 2048 only applies after a drug is "purchased at the 340B discounted price." Appellant Br. 36, *see id.* at 30, 34 (same). But if H.B. 2048 operates only ***post-sale***, then it never affects AbbVie's policy. That is because AbbVie's policy operates at the ***pre-sale*** offer stage. App.Vol.VI 1322-34. The 340B statute requires AbbVie only to make "offer[s]," not sales, and AbbVie's policy puts conditions on AbbVie's pre-sale offer. *Id.* at 1324 ("[I]f this provision isn't satisfied, we wouldn't complete that sale, that 340B requested purchase.... We would not" "sell the drug to the covered entity…"). So on the A.G.'s reading, H.B. 2048 would never apply to AbbVie. AbbVie doubts the A.G. intended to take that position, because it is unlikely Oklahoma passed a legal nullity of a statute.

***Third***, the A.G. waves away concern over conflicting state and federal enforcement. Appellant Br. 35-36. But these concerns are real. For enforcing its policy in Oklahoma, a manufacturer might find itself defending both an overcharge claim by a covered entity in ADR and an enforcement action under H.B. 2048 brought by the A.G. in a state

tribunal, risking conflicting adjudications. And it means state enforcement actions will become battlegrounds over novel but technical issues at the core of a federal program. *E.g.*, *Genesis Health Care, Inc. v. Becerra*, 701 F. Supp. 3d 312, 315 (D.S.C. 2023) (definition of 340B "patient" still contested). That is what Congress and the *Astra* Court said cannot happen.

Congress gave HHS sole enforcement authority for a reason. The 340B Program is intertwined with other programs like the Medicaid Drug Rebate Program, and "[f]ar from assisting HHS," external enforcement efforts "would undermine the agency's efforts to administer both Medicaid and § 340B harmoniously and on a uniform, nationwide basis," render HHS "unable to hold the control rein," and create a "substantial" "risk of conflicting adjudications." *Astra*, 563 U.S. at 120. Further, because of the complex subject matter, ADR officials must possess specialized "knowledge of the 340B statute and specific 340B Program operations." 89 Fed. Reg. at 28,644. This way, decisions from ADR panels so comprised will be "less likely to conflict with current 340B policy." *Id.*

"Though labeled differently, suits to enforce § 340B and suits to enforce [H.B. 2048] are in substance one and the same." *Astra*, 563 U.S. at 114. As the district court recognized, H.B. 2048 cannot be enforced consistent with federal law.

### B. Oklahoma's Law Impermissibly Regulates A Federal Program.

The Supremacy Clause prohibits states from singling out the federal government and those with federal contractual relationships for special regulations or burdens. *McCulloch v. Maryland*, 17 U.S. 316, 435-36 (1819); *United States v. Washington*, 596 U.S. 832, 839-40 (2022); *Boyle v. United Techs. Corp.*, 487 U.S. 500, 512 (1988). But H.B. 2048 does just that by targeting the federal 340B Program and participating manufacturers to impose discriminatory obligations on them beyond what federal law requires.[9] App.Vol.VII 1491, 1497; App.Vol.I 109-12; App.Vol.V 1095-96.

AbbVie executed a PPA (a contract) with the United States, trading access to Medicaid and Medicare Part B for an obligation to "offer" discounted drugs to congressionally identified providers. 42

---

[9] This holds true whether H.B. 2048 regulates "pricing," "delivery," or some hybrid of the two. Whatever H.B. 2048 does, it creates special state-law obligations for 340B-participating manufacturers.

U.S.C. §256b. This federal contractual relationship is underscored by the Spending Clause nature of Section 340B. *Barnes v. Gorman*, 536 U.S. 181, 186 (2002) ("Spending Clause legislation [is] 'much in the nature of a ***contract***: in return for federal funds, the recipients agree to comply with federally imposed conditions.'" (citation modified)).

"There can be little debate that the contract between" manufacturers and the government is a "matter of uniquely federal interest." *Helfrich v. Blue Cross & Blue Shield Ass'n*, 804 F.3d 1090, 1099-1100 (10th Cir. 2015) (citation modified); *see Boyle*, 487 U.S. at 504 ("obligations to … the United States under its contracts are governed exclusively by federal law."). But H.B. 2048 alters that contractual bargain. It inflates AbbVie's burden by imposing mandatory contract-pharmacy requirements, causing AbbVie to sell more discounted drugs where federal law would permit AbbVie to decline such sales. In other words, Oklahoma deemed the federal terms inadequate and imposed additional conditions on manufacturers' participation in the federal 340B Program—conditions ***not*** required by federal law. *Novartis*, 102 F.4th at 463-64; *Sanofi*, 58 F.4th at 704-05.

Those burdens apply ***only*** to 340B-participating manufacturers. Oklahoma's law uses the term "340B" over forty times, and it defines its key terms and operative provisions by reference to the federal statute. Okla. Stat. Ann. tit. 36, §§5400, 5401(1)-(2); 5402; 5403. H.B. 2048 exists only by reference to the 340B program, and if Congress repealed Section 340B tomorrow, Oklahoma's law would regulate nothing—a classic red flag. *Buckman*, 531 U.S. at 347.

Accordingly, Oklahoma's law is no neutral, generally applicable law that might survive Supremacy Clause scrutiny despite its burdens on a federal program. It expressly discriminates against 340B-participating manufacturers and regulates only the 340B transactions they conduct. *Washington*, 596 U.S. at 839-40. This is just like *Washington*, where a state law imposed more onerous requirements on any "contractor or subcontractor, who was engaged in the performance of work, either directly or indirectly, for the United States." *Id.* at 839. The Supreme Court found it invalid, and reiterated classic Supremacy Clause principles—dating back to a state's attempt to tax the National Bank in *McCulloch v. Maryland*—that states may not "discriminate against the Federal Government or those with whom it deals" by

"singl[ing] them out for less favorable treatment" or "regulat[ing] them unfavorably on some basis related to their governmental status." *Id.* (citation modified)

The district court correctly saw that H.B. 2048 "expands drug manufacturer's obligations under the federal 340B program" and "raises a manufacturer's price of admission to participate in Medicaid and Medicare Part B." App.Vol.VII 1491. As the federal government has explained, though, the "determination of what conditions to impose on 340B-participating manufacturers rests with Congress and HHS, not the States." U.S. Amicus Br. 11-14, 16-18; *e.g.*, *CoreCivic, Inc. v. Governor of New Jersey*, 145 F.4th 315, 322 (3d Cir. 2025); *Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 754-55 (9th Cir. 2022) (en banc).

If Oklahoma's law stands, every State will be free to append its own conditions to the federal 340B Program, raising the price of admission to Medicaid and Medicare Part B. *Washington*, 596 U.S. at 841. The Supremacy Clause bars that outcome. *Id.* at 835.

### C. Oklahoma's Law Overrides The 340B Program's "Offer"-Based Structure.

H.B. 2048 is preempted for overriding the 340B statute's "offer" structure and expanding the list of eligible 340B purchasers. The

district court correctly ruled that H.B. 2048's rewriting of Section 340B's terms renders it "contrary to federal law." App.Vol.VII 1496-98; *see* App.Vol.I 110-12.

Federal law requires manufacturers only to "offer" drugs at the 340B price to covered entities. 42 U.S.C. §256b(a)(1). It does not require manufacturers to "sell" drugs, under any or all conditions. So, as the federal circuit courts have explained, federal law entitles manufacturers to shape their offers by requesting that covered entities accept reasonable commercial conditions. *Novartis*, 102 F.4th at 460-64; *Sanofi*, 58 F.4th at 703-06. Based on background contract principles that inform the statute's "offer" provision, Section 340B "***preserves***—rather than abrogates"—manufacturers' right "to impose at least some" conditions on those offers. *Novartis*, 102 F.4th at 460 (emphasis added); *see Sanofi*, 58 F.4th at 703.

Oklahoma's law repeals that choice by eliminating any "restrict[ions]" a manufacturer might place on its offer. Okla. Stat. Ann. tit. 36, §5403(A). It thereby strips manufacturers of contracting rights that federal law protects, and mandates that manufacturers sell drugs at the 340B price on any and all terms the covered entity

demands. *Murphy v. NCAA*, 584 U.S. 453, 477 (2018). That effectively amends Section 340B to replace the term "offer" with "sell," and in so doing, "stands as an obstacle" to Congress's design for the 340B Program. *Crosby*, 530 U.S. at 373 (citation omitted).

As a corollary, H.B. 2048 expands Congress's list of eligible 340B purchasers. Under federal law, only certain statutorily enumerated entities may access 340B pricing; contract pharmacies are not on the list. 42 U.S.C. §256b(a)(4). But H.B. 2048 requires AbbVie to provide drugs at the 340B price to any "340B entity," defined as a covered entity ***or*** "any pharmacy contracting with the [covered] entity." Okla. Stat. Ann. tit. 36, §5401(2); *see Brown*, 809 F. Supp. 3d at 1360; App.Vol.VI 1358-59 (pharmacies take title to drugs and are not covered entities' agents, violating HHS's assumptions); App.Vol.I 135. The district court correctly concluded that this expansion is "contrary to federal law." App.Vol.VII 1497.

Oklahoma cannot legislate away manufacturers' federal rights and expand their federal-program obligations just because it wishes Congress had squeezed more out of manufacturers. *Remund v. State Farm Fire & Cas. Co.*, 483 F. App'x 403, 410 (10th Cir. 2012) (state law

preempted for expanding coverage of private insurance policy provided under federal program). Oklahoma's attempt rudely "upsets Congress' carefully constructed balance by interfering with its chosen methods." *Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 769 (10th Cir. 2010). When Congress limits a federal program's terms "to a specific range," states cannot override that choice. *Crosby*, 530 U.S. at 376-80 (state law preempted for impeding Congress's "deliberate effort to steer a middle path" (citation modified)); *e.g.*, *United States v. Sup. Ct. of N.M.*, 839 F.3d 888, 928 (10th Cir. 2016) (state rule preempted because its "more onerous conditions than those required by federal law" impeded federal objectives); *Robbins v. New Cingular Wireless PCS, LLC*, 854 F.3d 315, 319-20 (6th Cir. 2017) (similar).

To escape *Novartis* and *Sanofi*, the A.G. chants over and over that the 340B statute is "silent" about delivery and contract pharmacies, such that Oklahoma may fill the "gap." Appellant Br. 7, 17-18, 23-25, 26, 31. But this argument is misplaced, and simply repeating the word "silence" does not make it true.

To start, the A.G. misses the fact that *Novartis* and *Sanofi*'s interpretation rested on the textual term "offer," and what an offer may

include. References to "silence" were incidental to what the text of Section 340B affirmatively provided.[10]

But even accepting the premise of supposed statutory "silence," the A.G. is wrong about what follows. The "fact that there may be gaps" in the 340B statute "does not establish that states are free to fill those gaps." *Skull Valley*, 376 F.3d at 1249. The federal statute may be literally "silent" about manufacturers' policies and drug "delivery," but HHS has filled that gap by creating a comprehensive ADR system for adjudicating manufacturers' policies. Whatever label the A.G. uses, HHS understands that the distinction between pricing and delivery can be "artificial," as the district court rightly found, App.Vol.VII 1494-95, which is why HHS characterizes the federal program as "related to drug pricing ***and drug distribution***." 89 Fed. Reg. at 28,644 (emphasis added). It is also why the A.G. overreads *Novartis* and *Sanofi*, isolating one concept (delivery) to the exclusion of the other (price). *Accord*

---

[10] Certain amici obsess over how many times a different manufacturer used the word "delivery" in *Sanofi*. Dkt. 56 at 24. It is unclear why that matters. AbbVie was not a party to *Sanofi* or *Novartis*.

*Morrisey*, 760 F. Supp. 3d at 455 (analogous law "about delivery *at a given price*, not delivery *per se*.").

This case thus looks like *Skull Valley*, where a state similarly attempted to gap-fill a federal law. 376 F.3d at 1249. This Court found the state's attempt preempted because the implementing federal agency had "itself filled some of the gaps" by regulation. *Id.* So too here: HHS has filled any "gap," precluding Oklahoma's efforts.

Moreover, treating supposed congressional silence as an invitation for state regulation ignores the nature of the 340B statute. Where, as here, Congress created eligibility requirements for a Spending Clause program, Congress's omissions are as important as its pronouncements. If Congress sought to encourage participation in the 340B Program by omitting a certain obligation in the 340B statute, that calculus goes to the core of Congress's objectives. *E.g.*, *Forest Park II v. Hadley*, 336 F.3d 724, 731-33 (8th Cir. 2003). All it means is Congress decided ***not*** to include H.B. 2048's obligations as a part of the bargain that AbbVie "voluntarily and knowingly accept[ed]" when it signed its PPA. *Barnes*, 536 U.S. at 186.

"Legislation is, after all, the art of compromise, the limitations expressed in statutory terms often the price of passage, and no statute yet known pursues its stated purpose at all costs." *Stanley v. City of Sanford*, 606 U.S. 46, 58 (2025) (citation modified). "[T]he textual limitations upon a law's scope must be understood as no less a part of its purpose than its substantive authorizations." *Id.* (citation modified). Laws are often "drawn not only to bar what they prohibit but to allow what they permit, and the inconsistency of sanctions here undermines the congressional calibration of force." *Crosby*, 530 U.S. at 380; *see Bradshaw*, 123 F.4th at 1178. And when a "federal scheme intentionally leaves a portion of the regulated field without controls, ***then*** the preemptive inference can be drawn—not from federal inaction alone, but from inaction joined with action." *Arizona*, 567 U.S. at 406-07 (citation omitted); *Teltech Sys., Inc. v. Bryant*, 702 F.3d 232, 238-39 (5th Cir. 2012) (similar).

The 340B Program is a prime example of legislative give-and-take. Congress managed competing concerns by ensuring that certain healthcare providers could access certain drugs while also inducing drug makers to enter the Program. As the district court observed,

"Congress limited the scope of the 340B Program to ensure that the price of admission wasn't too high, which might have the deleterious effect of causing drug manufacturers to opt out of Medicaid and Medicare Part B." App.Vol.VII at 1497; *see* U.S. Amicus Br. 11-14, 16-18 (same). The 340B statute—both what it includes and what it omits—is the result of that balancing act. *Contra* Appellant Br. 31.

Unfortunately, driving manufacturers out of 340B, Medicaid, and Medicare is no hypothetical. Shortly before the district court's ruling, the first major manufacturer exited these federal programs, citing the burdens of recent legislative changes. App.Vol.VI 1336-37. "As a result, the dozens of drugs [that manufacturer] previously supplied to Medicaid patients … are no longer available through Medicaid." U.S. Amicus Br. 17. Oklahoma's efforts to extract more out of manufacturers undermine Congress's ability to calibrate effective Spending Clause bargains.

Oklahoma may have preferred a more generous 340B scheme than the one Congress adopted, but when "different governments differ in their assessment …, one must prevail, and the Supremacy Clause says

… it must be the United States." *United States v. Bd. of Cnty. Comm'rs of Cnty. of Otero*, 843 F.3d 1208, 1215 (10th Cir. 2016).

### D. Oklahoma's Law Frustrates Manufacturers' ADR Access By Banning Necessary Claims Data.

H.B. 2048 also prohibits AbbVie from conditioning its 340B offers on submission of claims data by covered entities. That hamstrings AbbVie's ability to access the federal ADR process, presenting a significant obstacle to Congress's objectives. *Arizona*, 567 U.S. at 399. The district court correctly so held, and no circuit court has ruled otherwise. App.Vol.VII 1499-1500; App.Vol.I 114-15.

Before initiating an ADR claim, a manufacturer must first "conduct an audit." 42 U.S.C. §256b(d)(3)(B)(iv). HRSA claims authority to preapprove audits and requires "documentation" establishing "reasonable cause" to suspect diversion or duplicate discounting by a covered entity. 61 Fed. Reg. at 65,409-10. A covered entity need not cooperate with a manufacturer audit unless a manufacturer meets those requirements. *Id.*

Manufacturers are on their own. Congress and HRSA expect manufacturers will independently procure the documentation to justify an audit and ADR proceeding. As the evidentiary hearing showed, the

most reliable source for unearthing duplicate discounting—indeed, the only practical method—is claims data. App.Vol.VI 1327-30, 1338, 1342. "[T]he requirement of claims data is standard practice" in the industry. App.Vol.VI 1368. Covered entities already maintain such information, and their TPAs regularly access it, so submitting to a manufacturer poses little additional burden. *Id.*; *id.* at 1328; *Novartis*, 102 F.4th at 463. This is why the district made the factual finding that "claims data … [is] ***the*** way to detect possible diversion or double-dipping on discounts." App.Vol.VII 1500.[11] That finding, grounded in the record, was correct.

Because covered entities do not willingly share claims data, App.Vol.VI 1329, AbbVie conditions its 340B offers on their providing it. Indeed, HRSA has always understood that manufacturers could "require 'standard information'"—claims data—"from covered entities." *Novartis*, 102 F.4th at 463. By banning that condition, Oklahoma's law departs from longstanding practice and blocks manufacturers from

---

[11] The A.G. finds no support in HRSA's 1996 guidance suggesting that "[s]ignificant changes in quantities of specific drugs ordered by a covered entity" suffice for reasonable cause. Appellant Br. 37-38. That makes little sense today, when skyrocketing contract-pharmacy arrangements lead to spikes in 340B purchases all the time.

gathering the information necessary to access ADR. *Morrisey*, 760 F. Supp. 3d at 450-53 (analogous state law preempted for this reason).

That makes sense. Manufacturers do not know what they do not know, and the most realistic place to start looking for any anomalies that might justify an audit is in claims data. For example, AbbVie's witness explained at the hearing how he recently used claims data to expose three different covered entities billing AbbVie for the same single drug dispense—triple dipping. App.Vol.VI 1329. It would have been "impossible" for AbbVie to realize that without claims data. *Id.* Because "restricting the very method by which data collection is made ... frustrates drug manufacturers' ability to take the initial steps necessary to start the very audit required to access [ADR]," *Morrisey*, 760 F. Supp. 3d at 453, Oklahoma's law is conflict preempted.

### E. Oklahoma's Law Intrudes Into The 340B Program's Comprehensive Scheme.

H.B. 2048 is also field preempted. Field preemption applies when a "scheme of federal regulation [is] so pervasive as to [suggest] that Congress left no room to supplement" it. *Skull Valley*, 376 F.3d at 1240.

Section 340B establishes an exclusive federal field: It creates the 340B Program, which provides for special 340B transactions at 340B

discounts for 340B entities. Congress enacted a closed-circuit, federally administered drug pricing program integrated within the federal government's broader healthcare apparatus, one that is about both "drug pricing and drug distribution." 89 Fed. Reg. at 28,644. The Program comes complete with detailed rules governing covered drugs, ceiling prices, eligible entities, compliance obligations, and its own exclusive enforcement forum. *Astra*, 563 U.S. at 114, 120; 42 U.S.C. §§256b(a)(5)(C)-(D), (d)(1)(B)(v), (d)(3); 42 C.F.R. §§10.20 *et seq*.

H.B. 2048 regulates within this exclusive federal field. It regulates nothing ***but*** transactions undertaken pursuant to the 340B Program. The law's key terms and prohibitions are explicitly and exclusively tied to (and therefore regulate) 340B transactions. *See US Airways, Inc. v. O'Donnell*, 627 F.3d 1318, 1325-27 (10th Cir. 2010) (state policies preempted even if they only "generally implicate[]" an exclusive federal field); *Bradshaw*, 123 F.4th at 1178 (similar). H.B. 2048 unlawfully trespasses onto the purely federal 340B field, and is preempted. *Arizona*, 567 U.S. at 400.

## III. AbbVie's Takings Claim Is Likely To Succeed On The Merits.

The Takings Clause bars the government from taking "private property" for anything other than "public use." U.S. Const. amend. V. As the district court recognized, Oklahoma's law effects unconstitutional takings because it compels discounted sales—above what the 340B Program requires—so that others can sell the drugs at market price and retain the profits. App.Vol.VII 1502-05. This kind of conduct has ***never*** been allowed under the Fifth Amendment. *Calder v. Bull*, 3 U.S. 386, 388 (1798) (legislation invalid if it "takes property from A. and gives it to B."); *Kelo v. City of New London*, 545 U.S. 469, 477 (2005) (same). "No amount of compensation" can cure a taking for ***private*** use. *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 543 (2005). Unsurprisingly, multiple courts have concluded that laws like H.B. 2048 may effect unconstitutional takings. *Brown*, 809 F. Supp. 3d at 1360-62; *AstraZeneca*, 2025 WL 4092197, at *8-9.

### A. Oklahoma's Law Effectuates Physical Takings By Compelling Discounted Sales.

Oklahoma's law causes physical takings because it forces AbbVie to transfer its property at confiscatory prices—transfers the 340B Program does not compel. App.Vol.VII 1502; App.Vol.I 116. Federal

law does not require AbbVie to accommodate unlimited contract pharmacy orders. Rather, it "preserves" AbbVie's ability to place reasonable conditions on its 340B-priced offers. *Novartis*, 102 F.4th at 460. If a covered entity attempts to place orders beyond those limitations, no 340B-priced sale takes place. But under H.B. 2048, AbbVie must unconditionally transfer 340B-priced drugs to contract pharmacies. The goal and effect of H.B. 2048 is to increase the volume of 340B-priced drugs sold, thus compelling discounted sales beyond federal law—sometimes at penny prices. App.Vol.VI 1324, 1334-35, 1339; App.Vol.I 140-41.

Every 340B-priced sale that AbbVie would decline under federal law but must make under H.B. 2048 takes AbbVie's property. "[A]ll that is required to trigger the Takings Clause" is the law "requires that possession of property be transferred from its owner to another." *Teva Pharms., USA, Inc. v. Weiser*, 709 F. Supp. 3d 1366, 1376-77 (D. Colo. 2023) (state law forcing a drug manufacturer to sell epinephrine pens for free was a taking), *aff'd*, 2025 WL 2555552 (10th Cir. Sept. 5,

2025).[12] When the government acquires property for a third party, it effects a "physical appropriation[]" that "constitute[s] the clearest sort of taking." *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 148 (2021) (citation modified).

Oklahoma's law achieves this sort of physical taking by forcing AbbVie to transfer its pharmaceutical products to covered entities and commercial pharmacies. H.B. 2048 provides that a manufacturer cannot "deny, restrict, prohibit, or otherwise interfere with … the acquisition of a 340B drug by" a contract pharmacy. Okla. Stat. Ann. tit. 36, §5403(A). In plain English, that prohibits AbbVie from preventing covered entities or contract pharmacies from taking possession of AbbVie's drugs at 340B prices. Oklahoma thus forces sales or transfers of AbbVie's drugs at the 340B price that would ***not otherwise occur***. Absent this law, if a covered entity demanded unlimited contract-pharmacy use, AbbVie would not complete the sale. App.Vol.VI 1324 ("Q: So if a covered entity wanted to buy a drug at a

---

[12] *Teva* denied an injunction based on a preliminary determination that the plaintiff had an adequate remedy at law, 709 F. Supp. 3d at 1378-79, "but left open the possibility of awarding Plaintiff injunctive relief later should its remedy at law prove inadequate." 2025 WL 2555552, at *1 n.1. As explained below, *infra* Parts III.C, V, no legal remedy would suffice here.

340B price [not complying with AbbVie's policy], would you sell the drug to the covered entity in that circumstance? A: We would not."), 1334-35 (AbbVie would have to sell about $46 million in "net new drugs" under H.B. 2048), 1339 ("We're going to have to sell more at the 340B price under this law."); App.Vol.I 140-41. H.B. 2048 is not merely "restricting the terms of a commercial sale." Appellant Br. 39. It is compelling new sales in the first instance—a per se physical taking. *See Cedar Point*, 594 U.S. at 147; *Horne v. Dep't of Agric.*, 576 U.S. 350, 362 (2015).

The A.G. counters that H.B. 2048 imposes only negative obligations, not affirmative obligations. Appellant Br. 39-40. The problem is that H.B. 2048 imposes a ***double*** negative: AbbVie may ***not deny*** the acquisition of 340B-priced drugs when contract pharmacies demand it. Phrased affirmatively, then, AbbVie must provide drugs with steep discounts to those pharmacies against AbbVie's will (drugs the pharmacies then sell at full price to patients). Indeed, that is the whole idea. Appellant Br. 46 (acknowledging "increased funds [for contract pharmacies and covered entities] stemming from H.B. 2048").

The A.G.'s position would let states evade the Takings Clause with linguistic games. Just consider *Cedar Point*, which held that a

California regulation granting union organizers an affirmative right of access onto private land constituted a physical taking. 594 U.S. at 144, 149. On the A.G.'s view, however, California would have effected no taking if it simply dictated that landowners may "not deny" access to their land—no different in substance from the affirmative right. No precedent or principle suggests that states may evade the Takings Clause's protections so easily.

### B. Oklahoma's Law Is Coercive, Not Voluntary.

The district court correctly held that AbbVie does not voluntarily cooperate with H.B. 2048. App.Vol.VII 1502-03; App.Vol.I 118. In other words, AbbVie never voluntarily accepted any benefit from Oklahoma that could extinguish a takings claim. *Horne*, 576 U.S. at 365-66.

The only potentially voluntary 340B obligations AbbVie has ever undertaken are those in AbbVie's contract with the United States government. App.Vol.VI 1320-22; App.Vol.VII 1513-21. AbbVie signed that PPA to gain access to Medicaid and Medicare Part B. *See* 42 U.S.C. §1396r-8(a)(1). And its terms are set by Congress in the 340B statute. *See id.* §256b(a); *Astra*, 563 U.S. at 118. Neither federal law nor the PPA reference state-law obligations. It is therefore impossible

that Oklahoma's law is among the "unambiguous[]" terms that AbbVie "voluntarily and knowingly accept[ed]" when it signed its PPA. *Barnes*, 536 U.S. at 186; *see* U.S. Amicus Br. 11-12, 16-17 (state burdens not among those AbbVie accepted when voluntarily joining federal program).

What matters for takings purposes is whether ***Oklahoma's*** law—not the federal 340B Program—is voluntary. As the district court ably explained, the answer is no: H.B. 2048 "isn't Oklahoma charging admission to a market of its own creation, but rather Oklahoma demanding a ransom in exchange for continued access to another's market." App.Vol.VII 1503; *see AstraZeneca*, 2025 WL 4092197, at *9 (similar). Access to the federal 340B market is not a gift from Oklahoma that can vitiate a takings claim. *See Horne*, 576 U.S. at 364-66 (access to a market otherwise open is not "a special governmental benefit that the Government may hold hostage").

The A.G. largely ignores the central problem of different governments offering different (or no) benefits, as well as the contractual nature of AbbVie's 340B participation. He parrots statements like "AbbVie receives a valuable government benefit,"

Appellant Br. 42, without distinguishing ***which*** government is offering that benefit. Nothing in law or logic supports the proposition that AbbVie's participation in a ***federal*** program gives ***Oklahoma*** a free pass at AbbVie's property beyond what AbbVie agreed to do under federal law. As Judge Shelby has explained, "AbbVie voluntarily participates in the 340B Program in exchange for a ***federal*** benefit," but laws like H.B. 2048 "expand[] the 340B Program benefits for [the state] without providing any ***additional*** benefit or compensation to AbbVie." *Brown*, 809 F. Supp. 3d at 1362 (emphasis added).

The A.G. disregards this reality, arguing that the district court cited no "cases holding that all state regulatory requirements imposed in Medicaid and Medicare participants must be accompanied by an increased benefit." Appellant Br. 42.[13] But that assumes AbbVie is

---

[13] The A.G. finds no support in *Minn. Ass'n of Health Care Facilities, Inc. v. Minn. Dep't of Pub. Welfare*, 742 F.2d 442, 444-45 (8th Cir. 1984) (***state*** regulations granting access to ***state*** Medicaid program), or *Burditt v. U.S. Dep't of Health & Hum. Servs.*, 934 F.2d 1362, 1376 (5th Cir. 1991) (***federal*** requirements for hospitals participating in ***federal*** Medicare). These cases are unsurprising. Medicaid is a "cooperative federalism" statute whereby Congress expressly invites state participation; Medicare is not. None of this concerns the 340B Program, which is also not a cooperative-federalism law.

contesting the voluntariness of the 340B Program; AbbVie is not. AbbVie's position is the district court's:

> [t]here is no exchange of value because Oklahoma isn't giving the drug manufacturers anything they don't already have (i.e., access to the federal market) as compensation for forcing them to make discounted sales…

App.Vol.VII 1503. Different sovereigns have different obligations, and one sovereign's deal does not open the door for others to freeride. Put simply, states "may not broaden the [340B bargain] by riding the coattails of a federal benefit." *Brown*, 809 F. Supp. 3d at 1362.

The A.G.'s own lead case demonstrates Oklahoma's folly. In *Valancourt Books, LLC v. Garland*, 82 F.4th 1222 (D.C. Cir. 2023), the D.C. Circuit addressed Section 407 of the Copyright Act, which required copyright holders to transfer free copies of their work to the government. *Id.* at 1227. The court held that the coerced transfers of free materials were uncompensated takings with no "voluntary exchange" that might save the provision. In contrast to other sections that provided further rights, under Section 407, copyright holders did not need to transfer their works to receive the benefit of their copyright. This meant they "receive[d] no additional benefit for the works they

forfeit[ed]," and the provision thus could not "represent a voluntary exchange for a benefit—there [was] no benefit at all." *Id.* at 1232-33.

Just as Valancourt Books already enjoyed copyright protection, AbbVie is already entitled to participate in Medicaid and Medicare Part B because it has signed a PPA. So like the copyright holders, AbbVie receives no additional benefit for the additional property H.B. 2048 compels it to transfer.

In sum: AbbVie voluntarily participates in the federal 340B Program, but never agreed to Oklahoma's confiscatory scheme. *Brown*, 809 F. Supp. 3d at 1362; *see Va. Hosp. & Healthcare Ass'n v. Roberts*, 671 F. Supp. 3d 633, 666 (E.D. Va. 2023). The voluntariness doctrine poses no bar to AbbVie's takings claim.

### C. Oklahoma's Takings Are Not For Public Use.

The Fifth Amendment permits the government to appropriate property only if it serves a "public use." U.S. Const. amend. V. But H.B. 2048's compelled takings are not for "public use" and therefore can ***never*** pass constitutional muster, as the district court rightly held. App.Vol.VII 1503-04; App.Vol.I 117-18.

Covered entities and contract pharmacies are often private, nongovernmental entities. And takings that simply "confer[] a private benefit on a particular private party" or "benefit a particular class of identifiable individuals" are forbidden. *Kelo*, 545 U.S. at 477-78 & n.5; *see Calder*, 3 U.S. at 388 (legislation may not "take[] property from A. and give[] it to B."). But Oklahoma's law does just that: It forces AbbVie to transfer its products at confiscatory prices to private entities, enriching those entities at AbbVie's expense. That is no "public use." It is a taking for private use and is unconstitutional regardless of compensation. *Kelo*, 545 U.S. at 477; *Brown*, 809 F. Supp. 3d at 1361.

The record and hearing made clear that Oklahoma's law violates the Public Use Clause. Pharmacies generally sell 340B drugs at ***full price*** to 340B patients and non-patients alike, irrespective of their financial status. App.Vol.VI 1299, 1301-02; App.Vol.I 135. Neither covered entities nor pharmacies pass the windfall onto patients or must use these profits for uncompensated care. App.Vol.VI 1301, 1369. In fact, covered entities are incentivized to prescribe more lucrative brand drugs rather than generics, to generate more spread, which ***raises*** the price patients must pay. App.Vol.IV 841; App.Vol.VI 1429.

Instead, huge portions of the billions in 340B profits are diverted from covered entities to commercial pharmacies and third-party administrators, who take a significant slice of the spread from every dispense. App.Vol.VI 1299-1302; 1360-62, 1370-72; App.Vol.IV 945-47; App.Vol.VII 1504. The remainder that covered entities do receive, they direct into their "general fund[s]" without tracking how they spend it. App.Vol.VI 1372.

Expanding contract-pharmacy use, like H.B. 2048 does, has not benefited the needy communities the 340B Program was supposed to help. As the record shows, the growth in contract pharmacies has not been concentrated in underserved areas of Oklahoma, but rather in ***affluent*** areas, as pharmacies target more 340B profits. App.Vol.VI 1305-11; App.Vol.IV 814-31; App.Vol.II 523. The record further shows that exorbitant 340B profits have led to ***decreased*** rates of charity-care spending by covered entities as they partner with more pharmacies. App.Vol.VI 1385-91 (over the last decade, 340B profits have quadrupled but charity care has fallen 40%, both in Oklahoma and nationally); App.Vol.IV 908. Nor have increased 340B profits led to improved patient outcomes. App.Vol.VI 1305, 1310-11, 1385, 1391-97; App.Vol.IV

829-46, 908-09, 937-45. Moreover, because AbbVie's policy does nothing to alter whether or how patients can access their drugs at pharmacies, or how much they pay, App.Vol.VI 1325-26, 1367-68; App.Vol.1 132, nullifying AbbVie's policy (H.B. 2048's effect) has no effect on patient access or pricing.

None of this constitutes a "public use." The district court correctly ruled that Oklahoma's law forces private, A-to-B wealth transfers without benefiting patients or the public. App.Vol.VII 1503-04; *see Fort Collins*, 916 F.3d at 796-97 (10th Cir. 2019) (factual findings sufficient with a "rational basis in the record").

The A.G. ignores the record and instead supplies a smattering of misplaced and irrelevant sources—some for the first time on appeal. To argue that H.B. 2048 serves a public use, the A.G. cites:

- 14 words of legislative history (not cited below). Appellant Br. 12-13.
- A law review article (not cited below). *Id.* at 46.
- A web article from 2019, six years before H.B. 2048 was enacted. *Id.* at 45.
- A Supreme Court decision from 2022, three years before H.B. 2048 was enacted, that was about the Medicare statute, not Section 340B, and had nothing to do with contract pharmacies. *Id.* at 45.

- HHS guidance about the federal program's goals from 1996, twenty-nine years before H.B. 2048 was enacted. *Id.* at 46.

- Snippets from out-of-circuit courts opining about other states' laws in cases that had materially different records and did not discuss public use at all. *Id.* at 45-47.

None of the A.G.'s sources bear on the text, design, operation, or effects of Oklahoma's statute. Most are entirely irrelevant, as they predate H.B. 2048 or concern only the federal 340B Program. As for the A.G.'s cases, one expressly declined to reach the public-use question, *AbbVie Inc. v. Fitch*, 152 F.4th 635, 644 n.4 (5th Cir. 2025), while the other (*McClain*) did not even have a takings claim. Finally, some of the A.G.'s sources do not appear in the record at all, and the A.G. may not supplement the preliminary-injunction record on appeal. *Verlo*, 820 F.3d at 1125-26.[14] The district court, by contrast, considered multiple fact and expert witnesses who provided detailed testimony at the hearing.

---

[14] The A.G.'s amici, Dkts. 56, 59, also purport to offer new "evidence" on appeal, submitting new declarations and other exhibits. The Court should disregard this improper material, from nonparties no less. *N.M. Dep't of Fish & Game v. U.S. Dep't of Interior*, 854 F.3d 1236, 1240 n.1, 1254 n.23 (10th Cir. 2017) (rejecting attempt by government and amici to supplement record on appeal).

The A.G. ignores the actual record save for two footnotes. Appellant Br. 45 n.7 & 46 n.9. But these footnotes offer nothing more than a cursory summary of the A.G.'s witness's declaration that the district court considered and rejected. Indeed, the A.G. never once engages with the evidentiary hearing, which was what the district court invoked. App.Vol.VII 1503-04. That silence is telling. In any event, the A.G.'s footnotes come nowhere close to proving that the district court's factual findings were erroneous, much less clearly erroneous.[15] *See Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1075 (10th Cir. 2009) ("Where there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous.").

## IV. *McClain*, *Fitch*, And *Murrill* Do Not Apply Here.

Eschewing H.B. 2048's text, its operation, and the record, the A.G. relies on argument-by-string-citation. He rests his case largely on *PhRMA v. McClain*, 95 F.4th 1136 (8th Cir. 2024), and *Fitch*, 152 F.4th 635. But those cases neither govern nor persuade. The Fifth Circuit's

---

[15] Nor did the district court impose some "burdensome" standard of proof on the A.G., *contra* Appellant Br. 45-46. As plaintiff, AbbVie proved its affirmative case with significant evidence, and the A.G. simply failed to offer much of anything in response.

follow-up ruling in *AbbVie Inc. v. Murrill*, 166 F.4th 528 (5th Cir. 2026), is merely a *Fitch* clone and equally unavailing. The evidentiary record developed here directly refutes the factual predicates on which those cases rest. And the remainder of those decisions' analysis does not withstand scrutiny.

For starters, *McClain* involved a differently worded statute. The Arkansas law did not use the word "acquisition" (Oklahoma's does). Ark. Code Ann. §23-92-604(c). *McClain* also assumed that Arkansas's law merely regulated only drug "delivery" and not pricing, *see* 95 F.4th at 1143-45, which is not true in Oklahoma. *Supra* Part I. *McClain*'s analysis also did not engage with the ADR regulation or its text, 42 C.F.R. §10.21(a)(1), and did not consider that HHS adjudicates contract-pharmacy policies in ADR. *McClain* also had no occasion to consider any claims-data ban. *Supra* Part II.D. *McClain* also rested on assumptions that covered entities maintain title to drugs held at contract pharmacies and enjoy principal-agent relationships with those pharmacies, 95 F.4th at 1142-44, but the evidence here indicates the opposite, App.Vol.VI 1358-59; App.Vol.I 135.

Courts (including the one below) have since distinguished *McClain* based on the very limited evidence and argument presented there, *see Morrisey*, 760 F. Supp. 3d at 458-59. That even includes Eighth Circuit district courts, which do not apply *McClain* past its limited posture when there are plausible allegations that *McClain*'s assumptions do not hold true. *AstraZeneca*, 2025 WL 4092197, at *6-7; App.Vol.V 1269.

The Fifth Circuit cases are equally inapplicable. Both relied on factual assumptions that the record here disproves. *Fitch* expressly limited its holding several times to the "sparse record" and "insufficient evidence" before it, and expressly cautioned that if the Mississippi law "works the way that AbbVie alleges it does," it "would undoubtedly be a problematic statute." 152 F.4th at 639, 645, 648. In *Murrill*, another panel simply doubled down on *Fitch*. But *Murrill*, like *Fitch*, had no substantial record and lacked the evidence now before this Court.

Both cases likewise assumed that their state laws did not affect pricing, and they thought that Section 340B left a "gap" for the states to fill—wrong as a matter of first principles, *supra* Part I, but also inapplicable here, *see Skull Valley*, 376 F.3d at 1249. Further, both

failed to meaningfully address that laws like H.B. 2048 circumvent *Astra* by providing an alternative, state forum to adjudicate manufacturer policies and alleged overcharges. And both cases supposed that their states laws did not compel additional sales, which is not true here as a matter of text, practical effect, and record evidence.

*McClain*, *Fitch*, and *Murrill* thus rested on undeveloped records and weak interpretations of state law. And none had the benefit of the United States's considered views. The same goes for the district-court decisions the A.G. cites, which largely boil down to uncritically adopting *McClain*.

The A.G. would have this Court uncritically adopt nonbinding decisions and ignore differences in the record and the law—decisions that were themselves often uncritical adoptions of other materially different rulings. "Truly, this is turtles all the way down." *Rapanos v. United States*, 547 U.S. 715, 754 (2006) (citation modified). This Court should do what the district court did: Examine H.B. 2048's text, its operation, and the record, rather than engage in the A.G.'s preferred bean-counting exercise.

*   *   *

The district court's preliminary injunction rested on sound factual and legal conclusions, and AbbVie is likely to succeed. *RoDa*, 552 F.3d at 1209 ("Because the standard for abuse of discretion is high, and we find that the … judge clearly set forth its reasoning for granting the injunction, we affirm.").

## V. AbbVie Has Satisfied The Remaining Preliminary Injunction Factors.

Without a preliminary injunction, AbbVie will suffer an irreparable injury—one not compensable by money damages. *Id.* at 1210; *Edmondson*, 594 F.3d at 770-71; *see* App.Vol.I 141-42.

First, depriving AbbVie of its constitutional rights constitutes irreparable injury. *Fort Collins*, 916 F.3d at 806-07; App.Vol.VII 1505-06. Second, each new sale forced by H.B. 2048 injures AbbVie, and AbbVie has no recourse after the fact because sovereign immunity makes recovery of financial losses unlikely or impossible. AbbVie's expected losses attributable to Oklahoma's law are estimated at $46 million per year. App.Vol.VI 1334. That lost revenue will seriously harm AbbVie and hurt its ability to invest in research and development of life-saving products that patients need. App.Vol.I 141-42. If AbbVie

ultimately prevails in this case, that harm cannot be undone. *NIH v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2659 (2025). So the district court did not abuse its discretion in finding that AbbVie faces "large financial losses with little practical likelihood of recovering" should H.B. 2048 remain in force. App.Vol.VII 1505.

Finally, the balance of the equities and the public interest favor a preliminary injunction. Oklahoma "does not have an interest in enforcing a law that is likely constitutionally infirm," *Edmondson*, 594 F.3d at 770-71, as the district court correctly held, App.Vol.VII 1506-07. Further, H.B. 2048's perverse outcomes harm the public interest. Under Oklahoma's law, preventing diversion and duplicate discounting is harder. Oklahoma's law also increases the risk that manufacturers will be forced to exit federal drug reimbursement and discount programs—which would seriously harm both patients and the public. App.Vol.VI 1336-37; U.S. Amicus Br. 16-18.

H.B. 2048 may appear well-intentioned, and it is easy to cloak in altruistic rhetoric. Underneath the hood, however, the reality is starkly different. H.B. 2048 is a rent-seeking measure that transfers wealth from manufacturers to often-commercial entities, incentivizing them to

prefer the affluent over the poor, all while intruding into a federal program and undermining the uniformity and supremacy of federal law. Patients are an afterthought in this arbitrage scheme. This Court will best serve the public interest by affirming the preliminary injunction.

## CONCLUSION

For these reasons, this Court should affirm the district court's preliminary injunction.

## REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

Pursuant to Federal Rule of Appellate Procedure 34(a)(1) and 10th Cir. R. 28.2(C)(2), Appellants respectfully submit that oral argument will assist the Court in resolving this appeal. This appeal presents important questions about the extent to which state legislatures may rework a federal drug-pricing program to their own ends and require drug manufacturers to transfer their property to other commercial parties.

DATED: March 25, 2026

Respectfully submitted,

*/s/ Matthew S. Owen*

MATTHEW S. OWEN
MEREDITH M. POHL
LUCAS H. FUNK
JACK L. FERGUSON
KIRKLAND & ELLIS LLP
1301 PENNSYLVANIA AVE. N.W.
WASHINGTON, D.C. 20004
(202) 389-5000
matt.owen@kirkland.com
meredith.pohl@kirkland.com
lucas.funk@kirkland.com
jack.ferguson@kirkland.com

*Counsel for Appellees*

PAUL DEMURO
FREDERIC DORWART, LAWYERS PLLC
124 E. 4TH ST.
TULSA, OK 74103
(918) 583-9957
pdemuro@fdlaw.com

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of FED. R. APP. P. 32(A)(7)(B) because it contains 12,959 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(f) and 10th Cir. R. 32(B).

This brief also complies with the typeface requirements of FED. R. APP. P. 32(A)(5) and the type requirements of FED. R. APP. P. 32(A)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook font 14-point type face.

All required privacy redactions have been made as required by 10th Cir. R. 25.5 and the ECF Manual. If required to file additional hard copies, they will be an exact copy of the ECF submission. This document has been scanned for viruses with the most recent version of a commercial virus scanning program, CrowdStrike, and according to the program is free of viruses.

*/s/ Matthew S. Owen*
Matthew S. Owen

## CERTIFICATE OF SERVICE

I hereby certify that on March 25, 2026, I electronically filed the foregoing document with the United States Court of Appeals for the Tenth Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

*/s/ Matthew S. Owen*
Matthew S. Owen